BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General, Civil Division
AMANDA N. LISKAMM
Director, Consumer Protection Branch
MAX J. GOLDMAN (NYBN 5304597)
Trial Attorney, Civil Division
United States Department of Justice

    450 5th Street, N.W.
    Washington, DC 20001
    Telephone: (202) 353-7664
    Email: max.j.goldman@usdoj.gov

Attorneys for Petitioner
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Civil Action No. |
| Petitioner, | ) | |
| v. | ) | **PETITION FOR ORDER TO SHOW CAUSE AND APPLICATION FOR ENFORCEMENT OF ADMINISTRATIVE SUBPOENA** |
| IRHYTHM TECHNOLOGIES, INC., | ) | |
| Respondent. | ) | |

# TABLE OF CONTENTS

I.     INTRODUCTION.................................................................................................1

II.    RELIEF REQUESTED .......................................................................................1

III.   STATEMENT OF ISSUES TO BE DECIDED ................................................2

IV.    BACKGROUND ..................................................................................................2

       A.    The Administrative Subpoena.................................................................2

       B.    iRhythm's Assertion of Privilege Over Third-Party Consultant Reports and
             Related Materials ..................................................................................3

       C.    iRhythm's Responses to DOJ's Requests for Supporting Information ...............5

V.     ARGUMENT .......................................................................................................8

       A.    The Subpoena Should Be Enforced Because All the Requirements for the
             Enforceability of an Administrative Subpoena Have Been Satisfied .................8

       B.    iRhythm Has Not Established That the Third-Party Consultant Reports Are
             Protected by Any Privilege or the Attorney-Work Product Doctrine.................10

             1.    iRhythm Has Failed to Establish That the Withheld Documents Are
                   Protected by the Attorney-Client Privilege.............................................10

             2.    iRhythm Has Failed to Establish That the Withheld Documents Are
                   Protected Attorney-Work Product............................................................11

             3.    iRhythm Asserts a Privilege that Does Not Exist in the Ninth Circuit ...............13

VI.    CONCLUSION ....................................................................................................13

# TABLE OF AUTHORITIES

## Cases

*Admiral Ins. Co. v. U.S. Dist. Ct.*,
    881 F.2d 1486 (9th Cir. 1989) ................................................................... 11

*EEOC v. Children's Hosp. Med. Ctr.*,
    719 F.2d 1426  (9th Cir. 1983) ..................................................................... 9

*EEOC v. Fed. Express Corp.*,
    558 F.3d 842 (9th Cir. 2009) .................................................................... 8, 9

*Granberry v. Jet Blue Airways*,
    228 F.R.D. 647 (N.D. Cal. 2005) ............................................................... 13

*Hartford Fire Ins. Co. v. Garvey*,
    109 F.R.D. 323 (N.D. Cal. 1985) ............................................................... 11

*In re Grand Jury Subpoena*,
    357 F.3d 900 (9th Cir. 2004) ..................................................................... 11

*In re McKesson HBOC, Inc. Sec. Litig.*,
    Nos. C-99-20743 RMW, C-00-20030 RMW,
    2005 U.S. Dist. LEXIS 7098 (N.D. Cal. Mar. 31, 2005) ............................ 12

*In re Subpoena Duces Tecum*,
    228 F.3d 341 (4th Cir. 2000) ....................................................................... 9

*Lewis v. Wells Fargo & Co.*,
    266 F.R.D. 433 (N.D. Cal. 2010) ......................................................... 11, 13

*Mo. Baptist Med. Ctr. v. United States DOJ*,
    No. 4:22-MC-871 RLW, 2023 U.S. Dist. LEXIS 9295 (E.D. Mo. Jan. 19, 2023) ........................... 8

*Prudential Ins. Co. of Am. v. Lai*,
    42 F.3d 1299 (9th Cir. 1994) ....................................................................... 9

*Salomon Bros. Treasury Litig. v. Steinhardt Partners, L.P. (In re Steinhardt Partners, L.P.)*,
    9 F.3d 230 (2d Cir. 1993) .......................................................................... 12

*Tulsee Nathu v. City of Oakland*,
    No. 4:20-cv-05242-SBA (LB), 2022 U.S. Dist. LEXIS 126265 (N.D. Cal. July 13, 2022) ............. 12

*United States v. Diaz*,
    No. CR 05-0167 WHA, 2006 U.S. Dist. LEXIS 44883 (N.D. Cal. June 16, 2006) ......................... 13

*United States v. Golden Valley Elec. Ass'n*,
    689 F.3d 1108 (9th Cir. 2012) ..................................................................... 8

*United States v. Graf*,
    610 F.3d 1148 (9th Cir. 2010) ................................................................... 10

*United States v. Massachusetts Inst. of Tech.*,
    129 F.3d 681 (1st Cir. 1997) .......................................................................... 12

*United States v. Nobles*,
    422 U.S. 225 (1975) ...................................................................................... 12

*United States v. Plache*,
    913 F.2d 1375 (9th Cir. 1990) ..................................................................... 11

*United States v. Sanmina Corp.*,
    968 F.3d 1107 (9th Cir. 2020) ........................................................ 10, 11, 12

**Statutes**

18 U.S.C. § 24 ........................................................................................................ 3

18 U.S.C. § 3486 ..................................................................................... 1, 2, 3, 8, 9

**Rules**

Fed. R. Civ. P. 26 ................................................................................................ 13

**Other**

21 C.F.R. § 820.3 ................................................................................................... 4

21 C.F.R. § 820.30 ................................................................................................. 4

## I.      INTRODUCTION

In furtherance of an ongoing investigation involving federal health care offenses, the United States issued a subpoena *duces tecum* under 18 U.S.C § 3486 (commonly referred to as a "HIPAA subpoena") to iRhythm Technologies, Inc. ("iRhythm" or "Company") for certain documents.  Although responsive to the subpoena, the Company has refused to produce three third-party consultant reports assessing the design history of their devices, as well as hundreds of related communications that do not involve an attorney, while claiming them to be privileged and/or attorney-work product. They are not. Despite repeated requests, the Company was unable to produce information showing demonstrating that these protections are available here. For example, there is  no evidence that any iRhythm attorney conferred with the outside consultants, or relied on their reports, in connection with the provision of any legal advice.

Although the Company claims the reports are work product created in anticipation of litigation, it has yet to identify any pending or anticipated litigation substantiating this assertion. For example, although iRhythm contends that the reports were prepared in response to a then-employee's "complaints" regarding regulatory compliance, the Company does not even claim there was any basis to believe litigation with this employee was anticipated.

Moreover, even if the Company were to provide evidence to support its privilege and work-product assertions, the Company's assertions of privilege were eviscerated when it voluntarily provided all three reports to the complaining—and ostensibly adverse—employee. The law in the Ninth Circuit is clear: the voluntary disclosure of materials to a potential adversary in litigation constitutes a waiver of any privilege and work-product protections over the disclosed materials as well as any other documents that concern the same subject matter.

Thus, the Court should order iRhythm to show cause why it should not be required to produce the materials at issue and, absent a showing of good cause, order iRhythm to produce such materials without further delay.

## II.     RELIEF REQUESTED

The Government seeks an order requiring iRhythm to show cause why it should not be required to comply with the Government's administrative subpoena by producing the three third-party consultant reports identified herein as well as any withheld or redacted materials concerning the same subject matter.

1    Further, if the Court concludes that iRhythm has failed to show good cause why these materials are

2    protected from disclosure on the basis of the attorney-client privilege, the attorney-work product doctrine,

3    or the self-evaluative privilege, the Government requests that the Court order the materials to be produced

4    without further delay.

5    **III.    STATEMENT OF ISSUES TO BE DECIDED**

6        Whether iRhythm should be compelled to comply with the Government's subpoena by producing

7    certain responsive materials the Company wrongly claims as privileged or otherwise exempt from

8    disclosure because:

9        (1) the Company cannot carry its burden of demonstrating that the materials are protected from

10   disclosure on any of the following grounds: (a) attorney-client privilege; (b) attorney-work product

11   doctrine; or (c) self-evaluative  privilege; or, in the alternative,

12       (2) the Company waived any privilege or work-product protections over the three consultant

13   reports, and any documents concerning the same subject matter, when it voluntarily provided the reports

14   to a potential adversary in anticipated litigation.

15   **IV.    BACKGROUND**

16       **A.    The Administrative Subpoena**

17       iRhythm is a healthcare company headquartered in San Francisco, California that provides

18   ambulatory cardiac monitoring services, including to Medicare beneficiaries. These services include

19   continuous monitoring and mobile cardiac telemetry monitoring services using iRhythm's "Zio Systems."

20   The Zio Systems combine a wearable biosensor that continuously records electrocardiogram data with data

21   analytic software to help physicians monitor patients and diagnose cardiac arrhythmias.

22       On April 4, 2023, iRhythm accepted service of administrative subpoena *duces tecum* ("Subpoena")

23   issued to it, pursuant to the Health Insurance Portability and Accountability Act ("HIPAA"), 18 U.S.C.

24   § 3486. Declaration of Max J. Goldman ("Goldman Decl.") ¶ 3 & Ex. 1, Subpoena. The Subpoena was

25   issued in connection with the Government's investigation of iRhythm for possible federal health care

26   offenses (as defined in 18 U.S.C. § 24(a)), including under the Federal Food, Drug, and Cosmetic Act

27

28

("FDCA")). *Id* at ¶ 2-3.[1]   Among other things, the Subpoena sought communications and other documents concerning potential issues related to the Company's Zio Systems, including that the Zio Systems were failing to timely transmit patient cardiac data to physicians for review after the occurrence of a cardiac event.[2]  *See generally id.*, Ex. 1, Subpoena, Att. A. The Subpoena set a return date of May 17, 2023. *Id.*, Ex. 1, Subpoena. iRhythm began producing responsive documents to the Government beginning on June 7, 2023. Goldman Decl. ¶ 4.

**B.     iRhythm's Assertion of Privilege Over Third-Party Consultant Reports and Related Materials**

Among the materials produced by iRhythm in July 2023 was a document with the filename "iRhythm DHF Assessment Report 19OCT17 DRAFT.docx" ("FDA Group Report"), dated October 30, 2017, that was prepared by FDA Group, LLC ("FDA Group"). FDA Group is a private business that provides quality assurance, regulatory affairs and other consulting services to life sciences companies. *See generally* FDA Group Services Page, https://www.thefdagroup.com/services (last visited June 27, 2024). FDA Group—which is not affiliated with the United States Food and Drug Administration ("FDA") or iRhythm—is not a law firm and does not provide legal advice. *Id.* Because iRhythm had previously asserted privilege over the FDA Group Report in a prior unrelated DOJ investigation in 2021, the Government sequestered the document and brought it to the attention of iRhythm. Goldman Decl. ¶ 5.

In August 2023, iRhythm claimed that the FDA Group Report had been inadvertently produced and formally asserted privilege over the document. *Id.*, Ex. 2.  On September 8, 2023, iRhythm provided a privilege log that included the FDA Group Report as well as a document with the filename "Zio XT DHF Gap Assessment Report_15-Feb-2018.pdf" ("RAC Report"), dated February 15, 2018, that had been prepared by RAC Medical Consulting, LLC ("RAC"). Goldman Decl. ¶ 6, Ex. 3, entries 1, 255.  RAC (now known as Cosm) is a separate business that provides development, product testing, and quality

---

[1]        18 U.S.C. § 3486 authorizes the Attorney General to issue and serve subpoenas requiring the production of "any records or other things relevant" to an investigation of a "Federal health care offense" as defined by 18 U.S.C. § 24. A "Federal health care offense" includes, *inter alia*, specific violations of the Federal Food, Drug, and Cosmetic Act when the offense relates to a health care benefit program, whether public or private. *See* 18 U.S.C. § 24.

[2]        The FDCA, and its implementing regulations, establish certain requirements to assure that medical devices are safe and effective for their intended uses. These provisions relate to adulteration, misbranding and registration.

regulatory   compliance   services   to   medical   device   companies.   RAC   Homepage, https://www.racmedical.com (last visited June 27, 2024).

The abbreviation "DHF" in the filenames for these reports, as well as iRhythm's descriptions of these documents in its privilege log, suggests that these documents were assessments of the "design history file" for the Zio Systems. Under regulations promulgated under the FDCA, the term "[d]esign history file (DHF) means a compilation of records which describes the design history of a finished device." 21 C.F.R. § 820.3(e). Further, "[e]ach manufacturer shall establish and maintain a DHF for each type of device" and "[t]he DHF shall contain or reference the records necessary to demonstrate that the design was developed in accordance with the approved design plan and the requirements of this part." 21 C.F.R. § 820.30(j).

The privilege logs stated that the FDA Group and RAC Reports were protected in their entirety on the following grounds: "Attorney-Client Privilege; Attorney Work Product prepared in anticipation of employment, regulatory, and/or other litigation; Self-Evaluative Privilege." Goldman Decl. Ex. 3, Entries 1, 255. iRhythm's log provided the following justification for its privilege and work-production assertions over the FDA Group Report:

> Draft report of FDA Group assessing design history file compliance with FDA requirements as requested by iRhythm then Legal Counsel Denise Andresen*. Document reflects legal advice from iRhythm then Legal Counsel Denise Andresen* and was prepared at her request.

Goldman Decl. Ex. 3, Entry 1 (asterisks in original). The log provided a similar justification for the withholding of the RAC Report:

> Report of RAC Medical Consulting, LLC assessing design history file compliance with FDA requirements following FDA Group assessment of same. The FDA Group assessment reflects legal advice from iRhythm then Legal Counsel Denise Andresen* and was prepared at her request.

Goldman Decl. Ex. 3, Entry 255 (asterisk in original).

Subsequently, the Company asserted privilege over the entirety of another third-party consultant report: a document with the filename "iRhythm Gap Assessment Report_Final_03.18.2018.pdf" ("Moeini Report"), dated March 18, 2018, prepared by Golnaz Moeini. Goldman Decl. Ex. 12, entry 2931. Moeini is the founder and principal consultant of MedEdge Regulatory & Quality Consulting ("MedEdge"), yet another business that provides regulatory and quality services to medical device companies. MedEdge

LinkedIn Page, https://www.linkedin.com/company/mededge-regulatory-quality-consulting (last visited June 27, 2024). According to the Company's privilege log, the Moeini Report was "Attorney Work Product prepared in anticipation of employment, regulatory, and/or other litigation." Goldman Decl. Ex. 12, entry 2369. The log provided the following explanation in support of this assertion:

> Report of Golnaz Moeini assessing design history file compliance with FDA requirements in anticipation of litigation and following FDA Group assessment of same. The FDA Group assessment, which reflects legal advice from iRhythm then Legal Counsel Denise Andresen* and was prepared at her request, and related legal advice was the predicate for the Moeini report.

*Id.* (asterisk in original).

The privilege logs provided through April 10, 2024, indicate that the Company has withheld over 1,000 documents concerning these third-party consultant reports on attorney-client privilege or work-product grounds. The withholdings include copies, drafts, and iterations of the reports. They also include hundreds of e-mails and attachments concerning the same subject matter that were not sent to or from an attorney. *See, e.g.,* Goldman Decl. Ex. 12, entries 374–385; 2368–2369; 2374–2378. In the vast majority of the privilege log entries, the sole or principal justification for withholding these documents is that they purport to "discuss," "reflect," or "follow" the FDA Group Report and "[t]he FDA Group assessment reflects legal advice from iRhythm then Legal Counsel Denise Andresen* and was prepared at her request in anticipation of litigation" (or a substantially similar formulation). *Id.*

### C.    iRhythm's Responses to DOJ's Requests for Supporting Information

Starting on September 22, 2023, the Government requested that iRhythm substantiate it assertions of privilege over the three consultant reports by providing additional information. Goldman Decl. ¶ 7, Ex. 4. Among other things, the Government asked the Company to identify the persons who were involved in the provision or receipt of legal advice; the role (if any) the FDA Group Report played in those communications; the persons who received copies of the FDA Group Report; any retention or engagement letters between the Company and FDA Group; and the Company's efforts to determine whether the FDA Group could be produced in redacted form. *See generally id.* at 2–3. The Government also requested that iRhythm identify what pending or anticipated litigation for which the FDA Group and RAC Reports were prepared, including the adverse parties and the potential claims that iRhythm sought to prosecute or defend

against. *Id.* at 3–4.

On September 29, 2023, the Company, through counsel, responded that "[o]n or around July 25, 2017, iRhythm then-legal counsel Denise Andresen provided legal advice to Company management regarding the Company's response to complaints raised by a now former iRhythm employee regarding regulatory compliance." Goldman Decl. ¶ 8, Ex. 5 at 2. iRhythm claimed that Mark Day, Executive Vice President, pursuant to Andresen's legal advice and under her direction, retained FDA Group as a consultant so that Andresen could effectively evaluate the validity of the unnamed employee's complaint. *Id.* According to the Company, hiring a consultant to assist Andresen was necessary "[d]ue to the nature of the employee's complaints, and the fact that Andresen did not specialize in the complex regulatory landscape at issue." *Id.* With respect to the RAC Report, the Company contended that it was protected work product because it was "commissioned . . . as a direct response to its receipt of the FDA Group Report in anticipation of litigation stemming from the now-former employee's complaints." *Id.* at 6.

iRhythm stated that, between July 2017 and October 2017, Day communicated directly with FDA Group employees and a third-party auditor, Steve Yost, regarding an assessment of iRhythm's design history file regulatory compliance. *Id.* at 2. In contrast to Day's responsibilities, the Company admitted that Andresen's role during that period was limited to reviewing the contract between the parties and signing on behalf of iRhythm. *Id.*; *see also* Goldman Decl. Ex. 12, entries 361-372 (communications between Yost and FDA Group without counsel present).

On October 30, 2017, Yost sent a copy of the FDA Group Report to Day, Andresen, and personnel from iRhythm's product development and quality and regulatory groups. Goldman Decl. Ex. 5 at 2. Since then, approximately 30 other iRhythm employees have received the FDA Group Report. *Id.* at 3. One of those employees was Gina Catalano, a Senior Regulatory Affairs Specialist. Catalano received the FDA Group Report on March 23, 2018. *Id.*

On October 10, 2023, the Government requested that the Company identify the former employee who made the complaint and any actual or potential adverse parties iRhythm had identified at the time that FDA Group was retained. Goldman Decl. Ex. 6 at 1–2. The Government also requested that iRhythm produce all communications and other documents related to the complaint lodged by the former employee. *Id.* at 1. Because the Company's prior response did not do so, the Government also reiterated its request

that the Company identify the persons who provided or received legal advice following the retention of FDA Group and the role the FDA Group Report played in the provision of such advice. *Id.* at 2. The Government requested additional information about the RAC Report, including the identity of any attorneys who consulted with RAC, whether any legal advice was provided based on the RAC Report, and the identity of each person who received a copy of the RAC Report. *Id.* The Government also inquired whether the Company intended to assert privilege over the Moeini Report. *Id.*

On November 3, 2023, iRhythm responded that:

> The FDA Group Report was commissioned on the advice of iRhythm's then-legal counsel Denise Andresen following complaints raised by Gina Catalano, a former iRhythm Senior Regulatory Affairs Specialist who was part of the group responsible for oversight of Company compliance with regulatory requirements. At the time that the Company commissioned the FDA Group Report, it had identified Catalano as a potential adverse party in litigation.

Goldman Decl. Ex. 7 at 3. Thus, the Company gave the protected report it claims it prepared in anticipation of litigation to the very same person against whom the company anticipated being on the other side of the "*v*" in that litigation. iRhythm also acknowledged that, like the FDA Group Report, it voluntarily provided Catalano with a copy of the RAC Report. *Id.* at 5.

iRhythm contended that "directly following the Company's receipt of the FDA Group Report on October 30, 2017, the Company decided to implement remedial measures and further evaluate its compliance with applicable regulations" by hiring RAC. *Id.* at 4. The Company claimed that the RAC Report constituted attorney-work product because the "FDA Group Report, and legal advice provided by Andresen and the law firm Wilson Sonsini Goodrich & Rosati in connection with the commission of the FDA Group Report, was the predicate for the RAC Medical Report." *Id.* Regarding the Moeini Report, the Company stated that it "intends to assert work product protection over the Moeini Report because it was created in anticipation of litigation stemming from Gina Catalano's complaints." *Id.* at 6. The Company has since acknowledged that it also voluntarily provided the Moeini Report to the adverse party in the anticipated litigation, Catalano. Goldman Decl. Ex. 12, entries 2296–2299.

iRhythm's response to the Government was silent as to whether Andresen or any other lawyer consulted with the FDA Group, RAC, or Moeini, or relied on the reports prepared by these consultants, in

1    connection with the provision of any legal advice. *See generally* Goldman Decl. Ex. 7 at 3–5. Rather, the

2    Company expressly acknowledged that the involvement of iRhythm's in-house and outside counsel was

3    limited to providing input on the terms of Company's consulting agreements with FDA Group in July 2017

4    and RAC in November and December 2017. *See id.* at 3, 4.

5         iRhythm has provided no factual support for its assertion that it anticipated litigation with Catalano

6    other than the representations of its outside litigation counsel. It refuses to divulge any other details

7    regarding Catalano's complaint, including communications between the Company and Catalano regarding

8    her complaint and the consultant reports, because it says that information is also privileged. Goldman Decl.

9    Ex. 9 at 1. Moreover, iRhythm has failed to provide any contemporaneous information or documents

10   demonstrating that it had identified Catalano as a potential adverse party in litigation when the withheld

11   reports were created, nor has iRhythm identified any threatened or pending litigation between it and

12   Catalano. Goldman Decl. Ex. 8 at 1. iRhythm also asserted privilege over the full scope of services that

13   FDA Group provided, as set forth in the consulting agreement and other documents, on grounds that the

14   FDA Group Report "was prepared at the request of then Legal Counsel Denise Andresen." *See, e.g.,*

15   Goldman Decl., Exhibit 12, entries 351–352.

16   **V.    ARGUMENT**

17        **A.    The Subpoena Should Be Enforced Because All the Requirements for the Enforceability of an Administrative Subpoena Have Been Satisfied**

18        HIPAA subpoenas issued by DOJ under 18 U.S.C. § 3486 are enforceable as administrative

19   subpoenas. *See Mo. Baptist Med. Ctr. v. United States DOJ*, No. 4:22-MC-871 RLW, 2023 U.S. Dist.

20   LEXIS 9295, at *3-7 (E.D. Mo. Jan. 19, 2023). The scope of judicial review regarding the enforcement of

21   administrative subpoenas is "quite narrow." *See United States v. Golden Valley Elec. Ass'n*, 689 F.3d 1108,

22   1113 (9th Cir. 2012) (citation and internal quotation marks omitted). The "critical questions" for the Court

23   are: "(1) whether Congress has granted the authority to investigate; (2) whether procedural requirements

24   have been followed; and (3) whether the evidence is relevant and material to the investigation." *Id.* (citation

25   and internal quotation marks omitted). "Relevancy is determined in terms of the investigation rather than

26   in terms of evidentiary relevance." *EEOC v. Fed. Express Corp.*, 558 F.3d 842, 854 (9th Cir. 2009).

27   "Moreover, the relevancy requirement is not especially constraining" and is to be "generously construed"

28

1  to afford the Government "access to virtually any material that might cast light on the allegations." *Id.*

2  (citation and internal quotation marks omitted).

3      "If these factors are shown by the agency, the subpoena should be enforced unless the party being

4  investigated proves the inquiry is unreasonable because it is overbroad or unduly burdensome." *EEOC v.*

5  *Children's Hosp. Med. Ctr.*, 719 F.2d 1426, 1428 (9th Cir. 1983) (en banc), *overruled on other grounds as*

6  *recognized in Prudential Ins. Co. of Am. v. Lai*, 42 F.3d 1299 (9th Cir. 1994). Put another way, "[c]ourts

7  must enforce administrative subpoenas unless the evidence sought by the subpoena is plainly incompetent

8  or irrelevant to any lawful purpose of the agency." *Fed. Express Corp.*, 558 F.3d at 854 (9th Cir. 2009)

9  (citation and internal quotation marks omitted).

10      Here, the Subpoena should be enforced because all three elements are satisfied. Congress has

11  granted the Attorney General the authority to issue administrative subpoenas for relevant records "in any

12  investigation of a Federal health care offense." 18 U.S.C. § 3486(a)(i)(1)(I); *In re Subpoena Duces Tecum*,

13  228 F.3d 341, 346 n.1 (4th Cir. 2000) ("Congress enacted § 3486 to facilitate health care fraud enforcement

14  efforts after estimating that the health care dollars lost to fraud could be as high as ten percent of total

15  health care costs."). Pursuant to that authority,[3] the Government issued the Subpoena in connection with

16  its investigation of the Company for possible health care offenses in violation of the FDCA. There is no

17  dispute that the procedural requirements of the subpoena have been fulfilled. Finally, the records sought—

18  third-party reports, and related communications, assessing whether the Company's cardiac monitoring

19  devices were developed in accordance with the approved design plan—are relevant and material to the

20  investigation.

21      Importantly, iRhythm has never contended that the Subpoena is not enforceable; indeed, the

22  deadline for making any such arguments (May 17, 2023) has long since passed. *See* 18 U.S.C. § 3486(a)(5)

23  ("At any time before the return date specified in the summons, the person or entity summoned may, in the

24  United States district court for the district in which that person or entity does business or resides, petition

25  for an order modifying or setting aside the summons . . . ."). Thus, iRhythm challenges neither the validity

26  of the subpoena nor that the subpoena calls for the production of the documents it has withheld, but instead

27

28  _____

   [3]   The subpoena authority has been delegated and redelegated to certain subordinate officials
   of the Department of Justice, including the Director of the Consumer Protection Branch.

1   relies solely on its specious claim of privilege for its non-compliance.

2      **B.      iRhythm Has Not Established That the Third-Party Consultant Reports Are
3              Protected by Any Privilege or the Attorney-Work Product Doctrine**

4          iRhythm has failed to carry its burden that the three consultant reports are protected from disclosure

5   based on the (1) self-evaluative privilege; (2) attorney-client privilege; and (3) attorney-work product

6   doctrine. To the extent any such protections might otherwise apply, however, they were waived when

7   iRhythm voluntarily provided the reports to Catalano, who iRhythm contends was a potential adversary in

8   litigation.  For the same reasons, any materials concerning the same subject matter as the reports must be

9   produced as well.

10      **1.      iRhythm Has Failed to Establish That the Withheld Documents Are Protected
             by the Attorney-Client Privilege**

11         "A party asserting the attorney-client privilege has the burden of establishing the existence of an

12   attorney-client relationship and the privileged nature of the communication." *United States v. Graf*, 610

13   F.3d 1148, 1156 (9th Cir. 2010) (cleaned up). "Because it impedes full and free discovery of the truth, the

14   attorney-client privilege is strictly construed." *Id.* (citation omitted).

15         Whether information is covered by the attorney-client privilege is determined by an eight-part test:

16   (1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such,

17   (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his

18   instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) unless the

19   protection be waived. *United States v. Sanmina Corp.*, 968 F.3d 1107, 1116 (9th Cir. 2020).

20         Here, iRhythm has failed to show that any of the withheld materials at issue satisfy this strictly

21   construed test. For example, despite repeated requests from the Government, the Company was unable to

22   come forward with any evidence (save their own assertions) that the FDA Group and RAC Reports—

23   neither of which were prepared by, or with the assistance of, counsel—were used to provide legal advice.

24   Similarly, the vast majority of the withheld communications related to these reports also are not privileged

25   because they did not involve any attorneys or the provision of legal advice. With respect to the Moeini

26   Report, the Company does not contend that it is subject to the attorney-client privilege.

27         Further, if the Court were to accept iRhythm's unsupported contention that Catalano was a potential

28   adversary in litigation, then the Company waived the attorney-client privilege by voluntarily sharing each

PETITION FOR OSC AND APPLICATION FOR ENFORCEMENT OF ADMINISTRATIVE SUBPOENA
NO.                                          10

of the reports with that same adverse party—Catalano. *See Hartford Fire Ins. Co. v. Garvey*, 109 F.R.D. 323, 328 (N.D. Cal. 1985) (finding that disclosure to adverse party is inherently inconsistent with adversary system and waives both work-product protection and attorney-client privilege). By the same token, the Company waived privilege with respect to all communications referring or relating to the subject matter of the reports because "voluntary disclosure of the content of a privileged attorney communication constitutes waiver of the privilege as to all other such communications on the same subject." *Sanmina Corp.*, 968 F.3d at 1117 (citation omitted); *see also United States v. Plache*, 913 F.2d 1375, 1380 (9th Cir. 1990) (finding disclosure of privileged communication waived privilege "on all other communications on the same subject").

For the foregoing reasons, the Company has failed to carry its burden of demonstrating that the withheld materials are protected from disclosure by the attorney-client privilege. It has provided no evidence that the privilege applies, and even if it did, any privilege was waived.

### 2. iRhythm Has Failed to Establish That the Withheld Documents Are Protected Attorney-Work Product

"The work-product doctrine is a 'qualified' privilege that protects from discovery documents and tangible things prepared by a party or his representative in *anticipation* of litigation." *Sanmina Corp.*, 968 F.3d at 1119 (quoting *Admiral Ins. Co. v. U.S. Dist. Ct.*, 881 F.2d 1486, 1494 (9th Cir. 1989) (emphasis added). The primary purpose of the work-product rule is to "prevent exploitation of a party's efforts in *preparing for litigation*." *Id.* (emphasis added). The Ninth Circuit uses the "because of" standard to determine if a document was made "in anticipation of litigation." *In re Grand Jury Subpoena*, 357 F.3d 900, 906 (9th Cir. 2004). "The 'because of' standard does not consider whether litigation was a primary or secondary motive behind the creation of a document. Rather, it considers the totality of the circumstances and affords protection when it can fairly be said that the 'document was created because of anticipated litigation, and would not have been created in substantially similar form *but for* the prospect of that litigation.'" *Id.* at 907–08 (emphasis added); *see also Lewis v. Wells Fargo & Co.*, 266 F.R.D. 433, 441 (N.D. Cal. 2010) ("A generalized fear of litigation does not turn a compliance audit into attorney work product."). The Court should not simply take iRhythm's word for it, either. Rather, "[t]he party asserting work-product protection has the burden of establishing that the work-product doctrine applies to the

document or tangible thing in question." *Tulsee Nathu v. City of Oakland*, No. 4:20-cv-05242-SBA (LB), 2022 U.S. Dist. LEXIS 126265, at *7–8 (N.D. Cal. July 13, 2022).

Here, iRhythm has failed to establish that any of the documents were withheld due to actual or prospective litigation. The Company's work-product argument rests entirely on the bare assertion that Catalano, a then-employee responsible for oversight of the Company's compliance with regulations, made "complaints regarding regulatory compliance." The Company does not claim that Catalano threatened or commenced a lawsuit against the Company. Moreover, the mere fact that an employee responsible for regulatory compliance raised concerns in that area of business operations reflects, at most, an employee performing her job. This conclusion is underscored by iRhythm's acknowledgement that it shared the reports with Catalano. Thus, iRhythm has failed to provide a sufficient factual basis to conclude that the consultant reports, or the hundreds of withheld communications and other documents concerning the same subject matter as the reports, were attorney-work product created in anticipation of litigation against Catalano.

Even if the Court determines that the Company anticipated litigation against Catalano, the Government is still entitled to the withheld materials because iRhythm waived any work-product protections when it provided the reports to the supposed adverse party—Catalano. "The privilege derived from the work-product doctrine is not absolute. Like other qualified privileges, it may be waived." *United States v. Nobles*, 422 U.S. 225, 239 (1975). "Under this standard, the voluntary disclosure of attorney work product to an adversary or a conduit to an adversary waives work-product protection for that material." *Sanmina Corp.*, 968 F.3d at 1121; *In re McKesson HBOC, Inc. Sec. Litig.*, Nos. C-99-20743 RMW, 1123, 1125, 1127, 1136, C-00-20030 RMW, 233, 234, 2005 U.S. Dist. LEXIS 7098, at *32–34 (N.D. Cal. Mar. 31, 2005) ("Disclosure to an actual or potential adversary waives work product protection as to the material disclosed.") (citing *United States v. Massachusetts Inst. of Tech.*, 129 F.3d 681, 687 (1st Cir. 1997)); *see also In re McKesson HBOC, Inc. Sec. Litig.*, 2005 U.S. Dist. LEXIS 7098, at *38–39 ("In general, waiver of work product protection as to 'one opponent, waives it as to all.'") (quoting *Salomon Bros. Treasury Litig. v. Steinhardt Partners, L.P. (In re Steinhardt Partners, L.P.)*, 9 F.3d 230, 235 (2d Cir. 1993)).

iRhythm has directly acknowledged that it voluntarily provided Catalano, whom it claims was a potential adversary in litigation, with copies of the FDA Group, RAC, and Moeini Reports. Therefore,

under binding Ninth Circuit precedent, the Company expressly waived any work-product protections with respect to the reports. By the same token, the Company has waived any work-product protections with respect to all communications and other documents that concern the same subject matter as these reports. *United States v. Diaz*, No. CR 05-0167 WHA, 2006 U.S. Dist. LEXIS 44883, at *30–31 (N.D. Cal. June 16, 2006) ("Disclosure of privileged material waives the privilege as to all material on the same subject.").[4]

For the foregoing reasons, the Company has failed to carry its burden of demonstrating that the withheld materials are protected attorney-work product. Even if the Company could carry its burden, it waived this protection when it voluntarily disclosed the reports to a potential adversary in litigation.

### 3. iRhythm Asserts a Privilege that Does Not Exist in the Ninth Circuit

Finally, the self-evaluative privilege is not recognized in the Ninth Circuit and is therefore improper for iRhythm to invoke here. *See Lewis*, 266 F.R.D. at 439 ("[T]his Court agrees with the many other courts that have concluded that in the Ninth Circuit, at least, such a privilege does not exist.") (citing *Granberry v. Jet Blue Airways,* 228 F.R.D. 647, 650 (N.D. Cal. 2005) (collecting cases)). iRhythm offered no authority to the contrary in its correspondence with the Government.

## VI. CONCLUSION

For all the reasons stated above, the Government respectfully requests that the Court order iRhythm to show cause why the Company should not be required to produce the withheld materials identified above, and, absent good cause shown, order the production of such materials without further delay.

---

[4] If the Court finds that iRhythm has established that the withheld materials are protected work product, and that such protection was not waived, the Government reserves the right to contend that they should nonetheless be produced because there is a "substantial need" for these materials and there is no other means for obtaining that information without undue hardship. Fed. R. Civ. P. 26(b)(3).

DATED: July 1, 2024

Respectfully submitted,

AMANDA N. LISKAMM
Director, Consumer Protection Branch

MAX J. GOLDMAN
Trial Attorney

*Attorneys for Petitioner United States of America*